and his official capacity as President of the United States of America et al. Mr. Muce for the appellants, Ms. Allen for the appellees. Good morning. Good morning. May it please the Court. I'm Robert Muce, and it's my privilege to represent the plaintiffs' appellants in this case, and I'd like to reserve two minutes of my time for rebuttal. The challenge of executive action in this case is unlawful in a court of law,  Mr. Muce for the appellants, Ms. Allen for the appellees, and I ought to say so. As Circuit Judge Brown recently cautioned in her concurring opinion in the Sheriff Arpaio case, the Court should not engage in an overly restrictive view of standing in cases like this for the fear that executive actions may be insulated from legal challenge. While the sitting doctrine does not stand as a barrier for plaintiffs to challenge executive actions in this case, and obviously that's what the issue before this Court was, whether or not the plaintiffs have standing to advance their constitutional and administrative executive action. Let me ask you a very basic question. For the 2014 plan, you're seeking injunctive and declaratory relief, but that's 2014. There's nothing we can do about that, right? We can't give you any injunctive or declaratory relief for the 2014 plan. It's over and done, right? Well, for the 2014, but there is... Just the 2014. That's all I'm asking about. Correct, Your Honor. And for the 2015 plan, those straits have already been set. There's nothing we can do in terms of declaratory injunctive relief for the 2015 plan either, is there? I don't know if that's necessarily true, Your Honor. They do make great changes throughout, but the point, and let me just get to the broader point for declaratory injunctive relief, is the recent letter that the government submitted to this Court indicates that these executive orders, these executive actions are going to continue on into 2017. So our basis for standing is really twofold. We are claiming an economic harm, and that's based on predictable harm based on basic factors of economic law, which the Court has held in other cases is sufficient for the determining injury in the future. So your focus is then on future injury? It has to be, Your Honor. Because that's all we have is injunctive declaratory relief, and it is prospective. And that's why I think it's important that as they notify this Court that these executive actions, this so-called transitional policy, and these other executive actions that excuse non-compliant plans... Then your burden is to show that as a result of these executive policies, Blue Cross Blue Shield is going to raise its rates on you, right? That's the burden that you have to show for standing. Well, there's two bases for injury here. One is the fact that we're subject to penalty. This case is different than some of these other cases. For example, the GMC case where they're challenging a tax that's imposed on the seller of natural gas, and GMC was actually the buyer. Here we are subject to penalty. We are being forced into these risk pools, which are higher risk pools, and based on what we believe to be unlawful executive action, these risk pools have now been narrowed, and the predictable economic result of that is that the costs increase. Is it all that predictable? I mean, I noticed that you relied on the 2014 filing in which Blue Cross Blue Shield asked for a rate increase, but then later they asked for a rate decrease. So how predictable is it that the rates will go up? Well, I think based on economics it's predictable. And let me cite to this, the court cited, or I'll cite to this. What about that one example? Apparently it wasn't so predictable. Well, if you look in their actuary, in their memorandum that we submitted to this court, they made it clear that the fact that the market is allowing these noncompliant plans is going to have an impact on rates. But let me just add this, because I think this is an incorrect assertion on the part of the government. I think your questioning is going towards this point. I don't think the burden for us is to necessarily show that our premium on any particular date is going to be higher than a previous date. I think what we have to show is that this executive action has caused a material basis for a change in the rate. For example, using that GMC case where the tax on the sellers of out-of-state natural gas, there could be a whole host of reasons that could affect the price for that natural gas. So on day one, the cost of natural gas might be $2 per whatever measure they use, whereas even after this tax, the price might go down. But the fact remains, that tax was a factor that affected those rates. And so even the court said, we presume. But if the tax went down, there wouldn't be an injury and there wouldn't be standing. If the price went down in the GMC case, there would still have standing as a challenge to that tax, because that tax had an impact on what that price was. See, the government wants to… Wait, wait, you're saying the price might otherwise have even been lower? No, what I'm saying is there might be other factors that could reduce the actual price of the natural gas. There could be other factors which could actually reduce the price of insurance. But this executive action was a factor that would have reduced it less or would have been a basis for having the prices higher. So that's… I mean, look at that Shirley v. Sebelius case. And this line of reasoning was recently affirmed by this court in the Arpaio case, where plaintiffs may claim predictable economic harms, and the two examples that were used, the lifting of a regulatory restriction on a direct and current competitor, in the court side of the Mendoza case, or regulatory action that enlarges the pool of competitors, will almost certainly cause an injury, in fact, to participants in the same market, citing the Shirley case. The Shirley case was an individual who challenged government regulations that had an impact on who could submit grant applications. And because they broadened the pool of those who could submit grant applications, that individual, the plaintiff, had standing because he was somebody who would submit grant applications. And because the pool was enlarged, it was likely that he would have less of an opportunity to submit grants. In our case, it is far more predictable that if you have… And, you know, the other point of this is the Congress relied on this specific finding of fact, and we cited the federal statute which sets out these findings of facts to make the claim that this was going to affect interstate commerce. And so this isn't like that Florida Audubon society case where the court just said we can't rely on, you know, just mere statements of congressmen that prophesy that there's got to be some, you know, future economic harm when it's not grounded in basic economic principles. Here we have congressmen making specific findings of fact, and the whole point of the statute of the Affordable Care Act is to broaden the pools, the risk pools, because now we have individuals who in the past wouldn't be allowed to have insurance because they were too risky, because they had pre-existing conditions, are now included into the risk pool. And because of that, they have to broaden the risk pool by the mandates so that the insurance premiums based on Congress would go down. And what this executive action has effectively done is it's narrowed those risk pools in a way that also incentivizes that those people who are the highest risk would be in my risk pool because they're the only ones that can get a compliant plan. Therefore, the prices, just on pure economics, that is going to cause those premiums to change. Now, there might be other factors that might cause the premiums to be lower, but they would have been lower had this executive action not been put in place. And the fact, the other point that's important is the penalty. You have to show that the premiums would move in a direction that's favorable to you, not just kind of in the abstract as a general, as will matter, but that the premiums that you would pay to Blue Cross would move in a direction favorable to you. The cost of insurance would have to adjust adversely based on this executive action. So, meaning that if they were going to have a rate decrease of 3%, but because of the nature of the pools, it would have been a rate decrease of 5%, that's a harm to me. It's a predictable economic harm based on basic economic sound economic principles. And those are predictions that the court allows. Of course, one can make statements about generalizable predictions about the way markets are going to react, but in order to establish the ending for your particular claim, you would need to show with the requisite showing that your insurer, Blue Cross, would, if the relief that you sought were obtained, would reduce the rates that you would pay. Not just some general sort of statements about how the market might react overall. I think I would have to show, just like in the prior case with the risk pool, based on economic principles that if this action reduces the risk pool of insurers, that that will have an adverse impact on premiums. And we can show that just based on basic economic principles. Just like the individual who was a grant applicant could show that based on basic economic principles. Those are predictable principles. And even in the rate filings, they made the point. We said at the Joint Appendix pages 80 and 86, they said that what affected due to the market being allowed to extend pre-ACA, Affordable Care Act, non-grandfathered plans into 2016, had an impact on their rates. As Judge Griffith points out, in the subsequent year, the rates went down. There was a decrease, and the same insurer cited the same causal factor for a reduction in the rates. They didn't cite that. It makes zero sense to say that we're going to narrow the risk pool to have higher risk individuals, that that's going to be a basis for reducing our rates. But isn't that what it said? I don't believe that's what it said. The 2015 document. There was changes in the rates, but it wasn't because they had a narrower risk pool. I mean, that doesn't even make sense from an economic perspective. And the fact is we're forced into this risk pool by the fact that we're subject to penalties. That's a whole other – I mean, we're subject to this law. That's another point that distinguishes this case from other cases, that if we're not in this compliant – we're in this compliant risk pool, then we're subject to penalty. And I think my time has run down here. Okay. We'll give you time back on everybody. Thank you. Thank you. Ms. Allen. Thank you, Judge Griffith, and may it please the Court. I'm prepared to answer any questions that the panel has. As we've already discussed, the plaintiffs here rely on general economic principles that are too general to establish standing to show that the transitional policy has caused an increase. Why are they too general? He cites Arpaio. Didn't we suggest in Arpaio that general economic principles might? Just to take a step back and look at what their economic theory is, this case is about the transitional policy, as you know, in which the HHS is not enforcing certain market reforms against health insurance issuers if they choose to continue a plan that they otherwise would have canceled. And plaintiff's theory is that if the market reforms were enforced and those insurers started offering comprehensive plans, that that would somehow cause Blue Cross Blue Shield, who's already offering comprehensive plans, to lower its premiums. And that chain of causation requires that the small employers that are currently enrolled in transitional plans, that those small employers would switch insurance carriers so that if the transitional policy were enjoined and, say, a small employer had a Humana plan that had to be canceled because it didn't comply with the market reforms and so Humana started offering a comprehensive plan, plaintiffs have to assume that the small employer would switch from Humana to Blue Cross Blue Shield and enter the Blue Cross Blue Shield risk pool. And that if those small employers entered the Blue Cross Blue Shield risk pool, the employees that would then enroll in the health care plans would actually make that risk pool less risky and that Blue Cross Blue Shield would then lower the rates. And there's really just nothing to support the speculation that small employers would switch from their current health insurance company to Blue Cross Blue Shield if the transitional policy were enjoined. What was Blue Cross Blue Shield? Put aside 2015 for a second and just focus on the one that's in the record, not the one that you all cited that came along later. But what was Blue Cross Blue Shield talking about in its rate submission when it said that a driver of the rate, and at that point it was a rate increase, was, as far as I could tell, was the transitional policy? Sure. Yes, Your Honor. In the 2014 document, which is a Blue Cross Blue Shield document, so I can't exactly speak to what Blue Cross Blue Shield was meaning, but what they stated was that they were requesting a 2.7 percent increase across all of their plans. But if you look at the chart on the next page, it shows that some of the plans they were requesting no change, some they were requesting that there was actually going to be a decrease expected, and then some there was going to be an increase. So put aside that. I get the point that we don't know the particular effect on this particular insurer of what amounts to a generalized increase. But what's the, to the extent, I know it's not your document, but Blue Cross Blue Shield is saying that the rates overall have gone up, and a significant driver for the rates overall going up is the transitional policy. No? Is that not how you read it? Well, so they list four factors, and they say that those are significant drivers that are the basis for them requesting the rate increase. It's not clear which of those factors actually, I think the first factor says that they had a favorable experience with the single risk pool. So that factor, for example, it's not clear whether it was actually one that would be driving rates up or down. So that's my question. Do you actually think that with respect to their comment about the, you don't disagree that the fourth one, the one that we're focused on, has to do with the transitional policy? That's correct. It appears to refer to the transitional policy. And later on in the same filing, Blue Cross Blue Shield states that because of the transitional policy, they were expecting to receive a large risk adjustment payment. And so our point is just that according to Blue Cross Blue Shield, according to their filing that plaintiffs submitted and plaintiffs are relying on, it's not clear whether Blue Cross Blue Shield itself thought that the transitional policy was increasing or decreasing the rates. And it's equally unclear whether Blue Cross Blue Shield was talking about AFLC's plan in particular. So it's clear that Blue Cross Blue Shield thought that the transitional policy was driving the rate request? That's correct. What you're saying is that you don't even know whether that particular factor was a bump up or a bump down? That's correct. It's unclear because later in the document they talk about receiving a rather large risk adjustment payment. And then in the 2015 filing, where Blue Cross says that the transitional policy is one of the reasons for the decrease, what they talk about in more detail is an even larger risk adjustment payment. So, again, this is not the government's document. It's Blue Cross Blue Shield's document. But doesn't it stand to reason that as you adjust the size of the pool, it's very likely to have an impact on the rates? And as I understand the argument, you're saying you're adjusting the size of the pool here, and it's having impact on my rates. And then, obviously, the merits argument is the way you're adjusting the size of the pool is unlawful. But what's wrong with that reasoning? Well, Your Honor, the congressional finding that they're relying on is about the health insurance market as a whole and the minimum essential coverage provision and the idea that as a whole, if you have everyone required to have health insurance, it will drive down rates. But what we're talking about here is much more specific. They would need to show that the small employers that would move to the Blue Cross Blue Shield risk pool would have healthier employees and would, therefore, make the risk pool less risky. And that's something that is completely speculative, and they've given no reason for this court to believe that small employers would move to Blue Cross Blue Shield or that if they did, they would happen to have healthier individuals that would lower the Blue Cross Blue Shield risk pool. If there are no further questions, we submit that the district court's decision finding no standing should be affirmed. Thank you. Mr. Mews. Yes, Your Honor, just briefly, bear in mind the court dismissed this case before there was any discovery taken. So there was a dismissal of the complaint. So even based on this court's decision in color, all we have to make is a plausible allegation of facts. And our economic theory for the harm is the type of a theory that this court has recognized as being acceptable. And it's even, it's affirmed by the congressional findings in this case, and it's affirmed by the Blue Cross rate filings themselves. And it just makes practical sense. When you restrict the pool of individuals who have to get this compliant insurance, it's going to have an impact, an adverse impact on rates. And that's all we have to establish, and we have established it. And certainly we've established it as much as this court found standing in the Shirley case. So we believe this court ought to reverse the district court's ruling. And if we need to take discovery further on the issue of standing, then so be it. But at this point, we've met our burden for the dismissal of the complaint. Thank you very much. The case is submitted.
judges: Griffith, Srinivasan, Wilkins